AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

7/16/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

7/16/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CGM _____ DEPUTY

United States of America

v.

YURIANA JULIA PELAEZ CALDERON,
aka "Juli"

Defendant

Case No.    2:25-MJ-04416-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about June 30, 2025, and July 6, 2025, in the county of Los Angeles in the Central District of California, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1001 | False Statement to a Federal Officer |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Tobias McCoy, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    7/16/2025

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Lana Morton Owens x3547

## AFFIDAVIT

I, Tobias McCoy, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against YURIANA JULIA PELAEZ CALDERON ("CALDERON"), charging her with violating Title 18, United States Code, Section 371 (Conspiracy) and Title 18, United States Code, Section 1001 (False Statements to a Federal Officer).

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.  BACKGROUND OF SPECIAL AGENT TOBIAS McCOY

3.    I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since November 2023.  I am currently assigned to HSI Los Angeles, El Camino Real Financial Crimes Task Force, which is responsible for investigating federal crimes involving child exploitation, child pornography, cybercrimes, human-rights violations, human smuggling, smuggling of narcotics, weapons, and

other types of contraband, financial crimes, and various other violations of immigration and customs laws.

4.    I previously retired from the United States Army as a Counterintelligence Special Agent with over 20 years of active-duty service.  I am also a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program, HSI Special Agent Training Course, Army Counterintelligence Special Agent Course, Defense Strategic Debriefing Program, Counterintelligence Surveillance Course, Countersurveillance /Surveillance Detection Course, Advanced Interrogation Training Techniques Course, and obtained a bachelor's degree in criminal justice from Colorado Christian University.

5.    Since becoming a HSI Special Agent, I received additional formal training at the Federal Law Enforcement Training Centers in Glynco, Georgia, on matters related to federal investigation, including but not limited to, obtaining federal search warrants, searching digital devices, and what types of evidence can be found on digital devices for immigration and drug offenses.  I have participated in many aspects of criminal investigations, including reviewing evidence, conducting physical surveillance, and the execution of search, arrest, and seizure warrants.  Additionally, I have interviewed witnesses who had personal knowledge regarding the investigations in which I have been involved.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    As set forth in more detail below, I submit that there is probable cause to conclude that CALDERON and others planned a hoax kidnapping, claiming that CALDERON had been kidnapped at the hands of federal agents or those working for federal agents.  The hoax

kidnapping was for CALDERON and others' benefit, including their own
pecuniary gain.  When confronted with true information that
contradicted their kidnapping story, CALDERON and others lied to
federal agents.  Moreover, once CALDERON and others learned that
federal agents were searching for CALDERON, her co-conspirators
attempted to thwart law enforcement efforts by keeping CALDERON's
whereabouts from law enforcement.  As set forth below, CALDERON and
others conspired and intentionally caused HSI and other law
enforcement agents to look for CALDERON believing that she was in
danger, when in fact, CALDERON and others faked the kidnapping and
knew she was safe.  There is therefore probable cause to conclude
that CALDERON committed the acts of conspiracy against the United
States (18 U.S.C. § 371) and false statement to federal officers (18
U.S.C. § 1001).

## IV. STATEMENT OF PROBABLE CAUSE

A.    The Press Conference

7.    On or about June 30, 2025, an attorney for "Movement
Legal," CALDERON's daughter ("Co-Conspirator 1"), and others held a
press conference to announce CALDERON's reported kidnapping on June
25, 2025.  I have reviewed a recording of the press conference.[1]
According to the attorney for Movement Legal, who spoke on the
family's behalf at the press conference.  The attorney stated that
CALDERON was taken from a Jack in the Box parking lot to the border
in San Ysidro and that "she was presented to an ICE staffer" and

---

[1] The press conference footage aired on several Los Angeles
television channels. https://ktla.com/news/local-news/l-a-mother-
taken-to-u-s-border-being-held-until-she-self-deports-attorneys/

"presented with voluntary self-deportation paperwork."  The attorney then added that when CALDERON refused to sign the paperwork and demanded to speak to a judge and attorney, "she was punished" and sent to a warehouse in an undisclosed location.  The press conference garnered substantial media attention and stoked fear in the community.

B.    HSI Begins Investigating CALDERON's Disappearance as A Kidnapping

8.    On or about July 2, 2025, Los Angeles Police Department ("LAPD") Detective Omar Franco informed HSI Supervisory Special Agent ("SSA") Michael Browning that on June 26, 2025, Co-Conspirator 1 filed a missing person report with the LAPD.  I have reviewed the report, and it states the following:  Co-Conspirator 1 claimed that a family friend ("Individual 1") informed her via phone call, that on June 25, 2025, at approximately 8:00 p.m., he was on the phone with CALDERON.  Individual 1 stated that while CALDERON was on the phone with him, and while CALDERON was in the area of 14th Street and Alameda, he heard CALDERON possibly state that she was being followed by unknown person(s).  Individual 1 further stated to Co-Conspirator 1 that he possibly heard CALDERON state "[y]ou don't need to use force I will get out of the car on my own."  Co-Conspirator 1 stated that CALDERON was possibly in ICE Detention, but she could not locate CALDERON on the Immigration website, and she was told to make a Missing person's report.[2]

---

[2] TFO Mazon later interviewed Individual 1 who relayed a nearly identical story.

9.    SSA Browning reviewed DHS indices and confirmed that CALDERON was not in DHS custody.

10.    Furthermore, based on SSA Browning's review, he learned from DHS indices that CALDERON was a citizen of Mexico who was paroled into the United States by another federal law enforcement agency.  Based on my training and experience, I know that when an individual is paroled into the United States by law enforcement, it is usually because they are an integral part of an ongoing investigation.  DHS indices also indicated that CALDERON's parole into the United States expired in approximately November 2023 and that CALDERON remained in the United States without authority.  SSA Browning became concerned that CALDERON may have been kidnapped because of her prior work with federal law enforcement and opened a federal investigation.

11.    On July 3, 2025, SSA Browning and I contacted Co-Conspirator 1 by phone.  In summary, both Co-Conspirator 1 and an attorney for Movement Legal – who came on the phone during the call – told us the following information:

      a.    On June 25, 2025, CALDERON was driving to work when she noticed two cars following her.  CALDERON pulled into a Jack in the Box parking lot, located at 1415 S Alameda St, Los Angeles, California 90021.  Masked men approached CALDERON in her vehicle and "arrested" her.  CALDERON was then taken to San Ysidro and asked to sign paperwork for voluntary deportation.  CALDERON and others refused to sign.

      b.    A few days later, Co-Conspirator 1 received a text message from an unknown number indicating that CALDERON was being held in a warehouse in San Clemente.  I have reviewed toll records

that show it was CALDERON's iPhone that called Co-Conspirator 1, but the number was intentionally masked to appear as an unknown number.

      c.    On or about July 3, 2025, shortly before Co-Conspirator 1's conversation with HSI agents, CALDERON called Co-Conspirator 1 from an unknown number and informed her that she might be released soon. Based on toll records I have reviewed, it was CALDERON's iPhone that made this call.

      d.    When asked how CALDERON was making contact while in "custody," the attorney said that a guard had lent CALDERON a phone to make calls, and the number appeared as a "No Caller ID."

      e.    According to Co-Conspirator 1, CALDERON said that both men and women were being housed together.

    12.    I know based on my training and experience that the information provided by Co-Conspirator 1 and the attorney, specifically, that men and women were being housed together, does not comport with DHS housing practices, which require men and women to be housed separately. This caused me additional concern that CALDERON was being held against her will without lawful authority. SSA Browning and I told Co-Conspirator 1 and the attorney that HSI was actively working to locate CALDERON as we were concerned for her safety. We also told Co-Conspirator 1 and the attorney that CALDERON was not in immigration custody.

    13.    Later, on July 3, 2025, SSA Browning sent a text message to the Movement Legal attorney requesting a timeline of the calls between Co-Conspirator 1 and CALDERON in an attempt to pinpoint CALDERON's location and rescue her. At approximately 5:54 p.m., the attorney responded with a screenshot with four calls from a "No Caller ID" on Friday (June 27th), Saturday (June 28th), Monday (June

30th), and Thursday (July 3rd) at 11:25 a.m.  I later reviewed toll records, and all of these calls were made with CALDERON's iPhone.

14.  On July 3, 2025, at approximately 5:41 p.m., SSA Browning contacted Co-Conspirator 1.  SSA Browning asked for the exact times and duration of the "No Caller ID" calls.  Co-Conspirator 1 stated the call on Friday (June 27th) was at approximately 10:30 p.m. and lasted approximately 16 minutes.  The call on Saturday (June 28th) was at approximately 3:46 p.m. and lasted approximately 10 minutes. The call from that day (July 3rd) was at approximately 11:25 a.m.

15.  Based on the fact there was no record of CALDERON being in federal custody and the sensitive nature surrounding her past involvement with a federal investigation, SSA Browning deemed it appropriate to contact T-Mobile to request emergency GPS location on CALDERON's telephones.  CALDERON had two known phones, an iPhone and a Samsung.

C.  Co-Conspirator 1 Set Up a GoFundMe Page For CALDERON

16.  Based on my review of GoFundMe.com, an online platform that enables individuals and organizations to solicit donations and raise money through crowdfunding, I know that on or about July 2, 2025, Co-Conspirator 1 set up a GoFundMe page claiming CALDERON "was taken by masked men in an unmarked vehicle on June 25th around 8:30 pm when she was on her way to work, and we have not been able to find her.  [CALDERON] is the head of our household and an amazing mother and very dedicated; she is also a great community member leader.  [CALDERON] takes care of [REDACTED INFORMATION REGARDING MINORS].  We are asking for help because we are also facing an eviction.  Every single dollar could help us at this moment, and we are hoping that we could find out where they have her.  We have

already looked in detention centers as well as warehouses, and we still have no idea why they did not process her." The stated funding goal of the page is $4,500.

    D.   <u>Video Evidence Shows Calderon Faked Her Own Kidnapping</u>

    17.  Based on video surveillance obtained by HSI on July 4 from Jack in the Box, but recorded on Wednesday, June 25, 2025, at approximately 8:20 p.m., CALDERON was at the Jack in the Box parking lot at the place and around the time where she was purportedly kidnapped. I reviewed this video on July 5, and I know that the woman on the video surveillance was CALDERON because I understand that the build of the woman on the video is consistent with CALDERON. Furthermore, when CALDERON was later shown this video, she did not deny it was her and immediately began changing her story, as described below. On the video, CALDERON pulled into the Jack in the Box on Alameda St in Los Angeles, driving a black Toyota Tacoma ("Tacoma"), and parked to the rear of the Jack in the Box. No other vehicles appeared to be following her. I later learned that the Tacoma was registered to CALDERON's friend, Individual 1, the person who told Co-Conspirator 1 that CALDERON had been kidnapped, as described above.[3] CALDERON sat in the Tacoma for several minutes before she calmly got out of the Tacoma, locked it, and walked northbound carrying a bag, passing a nearby Starbucks.[4]

---

[3] I have reviewed toll records from this time, and CALDERON's iPhone was talking to Individual 1's known phone number immediately before CALDERON got out of the Tacoma.

[4] Law enforcement attempted to obtain surveillance footage from Starbucks, but were informed the business had no cameras with a view of the parking lots.

18.   Based on Co-Conspirator 1 and Individual 1's statements –
at the same time CALDERON was calmly getting out of the Tacoma –
CALDERON told her Individual 1 she was being followed and pulled
into the Jack in the Box out of concern.  However, I have watched
the video footage repeatedly and CALDERON is walking at a normal
pace, not running, not looking around, and does not appear to be in
any distress.

19.   After leaving the Jack in the Box parking lot, CALDERON
then walked into the Starbucks parking lot located north of the Jack
in the Box and across the street from a Shell Gas station.
Surveillance footage showed a marked LAPD patrol car waiting at
Starbucks at the same time CALDERON passed by.  The video
surveillance shows that at no point did CALDERON exhibit signs she
was distressed; nor did she attempt to contact the marked LAPD
patrol car to report she was being followed.





20.    Surveillance footage from the Shell Gas station showed CALDERON walking towards a parked silver Nissan sedan.  CALDERON placed the bag she was carrying in the back seat of the Nissan, then opened the passenger car door, and got into the car.  I have watched this video, and CALDERON is again walking at a normal pace, and does not appear to be in any distress.  A few seconds later, the car left the parking lot and headed South on Alameda toward the I-10 freeway.





E.    Telephone Records Undermines CALDERON's Story

21.    Based on phone records, there were no calls made on either of CALDERON's phones after CALDERON parked and exited the Tacoma on June 25, 2025.  At some point after the last phone call at 8:13 p.m., which lasted until 8:22 p.m., CALDERON appeared to have turned off her known iPhone.  I believe this was in order to claim at a later time that she was taken by ICE or others working for ICE.

22.    On July 3, 2025, at approximately 7:40 p.m., the first positive location hit was received from T-Mobile for CALDERON's Samsung.  Up until that time, the information from T-Mobile indicated the phone was powered off and/or not in range of any cell tower.  The first positive location showed the phone in the area of Earlimart, California.  Subsequent GPS information showed the phone remained in the area of Earlimart, California and then began to move south along the 99 Highway towards Bakersfield.

23.    Between approximately 9:30 p.m. (July 3) and 4:00 a.m. (July 4), CALDERON's Samsung was in the vicinity of Fairview Road and S. Union Avenue in Bakersfield, California.

24.    On July 4, 2025, I identified a telephone number in common contact with Co-Conspirator 1 and CALDERON.  Based on databases

11

available to law enforcement, this phone number was subscribed to someone living at a Darling Point Drive house (the "Darling Point Residence") in Bakersfield, California. This address was within the vicinity of the last known location of both CALDERON's phones.

25. SSA Browning attempted to call Co-Conspirator 1 on July 4th to inquire if she had further photos of her mother, CALDERON, and to generally check in. SSA Browning's calls and texts went unanswered.

26. Cell-site information revealed that CALDERON's iPhone phone left the Bakersfield area on June 30, 2025, traveled to the area of Earlimart, and then back to vicinity of the Darling Point Residence in Bakersfield.

F.    HSI "Found" CALDERON at a Shopping Mall in Bakersfield

27. On July 4, 2025, a HSI agent in Bakersfield conducted surveillance on the Darling Point Residence where CALDERON's Samsung phone was, based on cell-site data. This agent saw a white Honda SUV (hereinafter "the Honda SUV") parked at the residence. The Honda SUV is registered to Co-Conspirator 1. At approximately 4:20 p.m., the HSI agent saw two Hispanic females and a male Hispanic driver leave the residence in the Honda SUV. At approximately 4:40 p.m., the Bakersfield duty agent sent the below photo of the two Hispanic females from the Darling Point residence to HSI. Once SSA Browning received this photo, he saw that one of the women – the one on the left - looked like CALDERON and suspected that the alleged kidnapping was a hoax. SSA Browning mobilized a team to travel from Los Angeles to further investigate.



28.   On July 5, 2025, HSI agents from Los Angeles drove to the Darling Point Residence in Bakersfield, California.   At approximately 11:57 a.m., TFO Jorge Mazon saw CALDERON arrive in a Chevrolet truck.   This truck is registered to the Darling Point Residence.

29.   At approximately 1:20 p.m., TFO Mazon saw CALDERON and other people leave the Darling Point Residence in the Honda SUV. After following the Honda SUV to a nearby shopping plaza where the other female passengers left the Honda SUV, a male driver and CALDERON drove to the parking lot of Los Reyes Market at 2303 S. Union Avenue, Bakersfield, California.

30.   After the male driver left the Honda SUV to enter one of the nearby stores, SSA Browning, TFO Mazon, and SA Williams approached and contacted CALDERON.   Agents were in plain clothes and displayed their badges to CALDERON who rolled down her window.   The passenger identified herself as "Yuliana Peleaz CALDERON."   TFO Mazon is fluent in the Spanish language and was the primary contact

at the window.  As soon as law enforcement made contact, TFO Mazon
heard CALDERON spontaneously proclaim, "They saved me."  TFO Mazon
advised CALDERON that they were conducting an investigation and
asked her to step out of the vehicle to a shaded area.  TFO Mazon
advised CALDERON that she was not under arrest, but that law
enforcement needed to ensure she was safe given the claims of
kidnapping.  In summary, CALDERON told TFO Mazon the following:

     a.    CALDERON claimed she had been kidnapped and taken
into "custody" by unknown masked subjects on or about Wednesday,
June 25, 2025.  CALDERON was taken to San Ysidro and when she
refused to sign deportation paperwork, she was taken to an
undisclosed location.  CALDERON was then released on or about
Friday, July 3, 2025, at an unknown location.

     b.    Once she was released, she fled on foot and was later
assisted by unknown good Samaritans who encountered her while she
was walking.  The unknown good Samaritans assisted her and took
CALDERON to another unknown location where they contacted Co-
Conspirator 1.  When asked the whereabouts of Co-Conspirator 1,
CALDERON said she was back at the Darling Point Residence.

   31.  HSI agents thereafter went back to the Darling Point
Residence to contact Co-Conspirator 1, to further investigate.  At
the house, TFO Mazon, SSA Browning, and SA Williams contacted Co-
Conspirator 1.  Co-Conspirator 1 met them wearing pajamas and
appeared to have been at the house for some time.

     a.    SSA Browning identified himself as the agent who had
been looking for CALDERON and speaking to Co-Conspirator 1 about her
missing mother.  SSA Browning did not disclose that CALDERON was in
HSI custody.  Instead, SSA Browning said that agents were still

looking for CALDERON and asked why Co-Conspirator 1 had not returned any of SSA Browning's calls or messages.  SSA Browning told Co-Conspirator 1 that they were taking the disappearance very seriously, but that the footage from the Jack in the Box showed CALDERON walking away of her own will.

      b.   SSA Browning explained how law enforcement has attempted to locate CALDERON for days, but with little help from the family.  Co-Conspirator 1 responded that "they" told me not to talk to law enforcement, and "they" would reach out [SSA Browning believes that Co-Conspirator 1 was referring to employees at Movement Legal].  Co-Conspirator 1 added, "one of them is in the Bay area."  SSA Browning asked if Co-Conspirator 1 had any further contact with her mother.  Co-Conspirator 1 falsely stated CALDERON last contacted her on the morning she talked with SSA Browning, based on call records she provided.  SSA Browning asked clarifying questions to ensure Co-Conspirator 1 had not seen nor contacted her mother since SSA Browning last spoke to her.  Co-Conspirator 1 denied having seen her mother recently and the last contact was sometime during the middle of the week.

      c.   At that point, SSA Browning told Co-Conspirator 1 her mother was in a car down the street.  Co-Conspirator 1 did not appear surprised when faced with the fact that law enforcement had located her mother in Bakersfield.  Instead, she explained that she couldn't do anything without "their" approval.  When pressed on why, Co-Conspirator 1 just stated she couldn't do anything without "their" approval.  When asked why she did not contact law enforcement, or the media, Co-Conspirator 1 stated the attorneys were going to handle that and her aunt in Los Angeles was going to

15

contact LAPD.  She also stated her mother had been at the residence in Bakersfield since Thursday (July 3rd).  By July 3, 2025, numerous agents from both Los Angeles and Bakersfield had spent two days searching for CALDERON.

     d.    After Co-Conspirator 1 indicated she would like an attorney present, the conversation ended.  At that point, Co-Conspirator 1 was then arrested for making false statements to law enforcement, in violation of Title 18 U.S.C. § 1001.  HSI agents transported Co-Conspirator 1 to the HSI Bakersfield office where she remained for several hours.  Later that night, HSI agents released Co-Conspirator 1 and returned her to the Darling Point Residence.

     G.    <u>CALDERON Interviewed</u>

     32.    On July 5, 2025, SSA Browning and TFO Mazon interviewed CALDERON at the HSI office in Bakersfield, California.  TFO Mazon advised CALDERON of her Miranda rights from a Statement of Rights Form in the Spanish language, which CALDERON signed.  The following is a summary of CALDERON's statement, in part, as the interview was several hours.

     a.    After being shown the video of her at the Jack in the Box calmly walking away from the Tacoma with a bag, CALDERON now claimed that she was not "arrested" at Jack in the Box in Los Angeles, California.  Instead, she said that on June 25, 2025, she was driving to Los Angeles to meet someone and bring them clothing.  She parked in the Jack in the Box parking lot and started walking towards the Coca-Cola factory (located at S. Central Ave. and E. 12th St.).  I have reviewed footage from a nearby business and CALDERON did not travel in this direction; instead, as described

16

above, she got into a silver Nissan sedan a few minutes after she
gets out of the Tacoma.

b.    At that time, she noticed a Ford truck, a Durango,
and a van following her near a recycling center.  Men wearing masks
– one of whom appeared Black - got out vehicles and restrained her
with zip ties and put her into a van.  This is contradicted by video
footage from June 25, 2025, that I had reviewed.  CALDERON calmly
gets into a parked Nissan sedan that drove her to the 10 Freeway.

c.    CALDERON said there were other restrained people
inside the van into which she had been forced.  At some point, the
masked men picked up another restrained man.  The masked men spoke
English.

d.    CALDERON claimed she was taken to San Ysidro and
remembered driving through a gated area.  She knew it was San Ysidro
because the driver told her so.  The driver was wearing green.

e.    While at San Ysidro, she was presented with paperwork
for deportation.  CALDERON refused because she said she did not have
any deportation orders.

f.    One of the masked men broke CALDERON's phone.[5]
CALDERON could not provide her cell phone number to law enforcement,
but regularly carries two phones, one Samsung and one iPhone.
CALDERON claimed she did not know the passcodes to open her phones.

g.    CALDERON claimed she was able to hide the iPhone on
her person through the entire ordeal.

_____

[5] SSA Browning believes CALDERON was referring to the iPhone and
the same phone used to contact Co-Conspirator 1 from the "No Caller
ID" number.  I have reviewed the toll records and *67 was used to
mask CALDERON's iPhone.

h.    CALDERON said she pleaded with one of the guards to give her daughter's number and she obtained the phone number from the iPhone and wrote it on her leg (contradicting the earlier statement that she had hidden the iPhone).  The guard gave her a phone to call her daughter.  CALDERON had no explanation for why she did not notice it was her own phone that made the calls to her daughter when confronted with the call records.

i.    CALDERON also claimed that the calls with Co-Conspirator 1 were quick.  However, based on toll records, I know that the calls between CALDERON and Co-Conspirator 1 during this time lasted anywhere from 10 to 16 minutes.  In addition, based on call records that I have reviewed, the iPhone was in-use and contacted other telephone numbers two days before she claimed to have been released on July 3, 2025.  Cell-site information also shows this phone was in Bakersfield, in the same area of Darling Point Residence, days prior to her arriving on July 3.

j.    The same guard who gave her the phone, whom CALDERON called the "white agent," oversaw watching all the detainees CALDERON claimed were present.

k.    On July 3, 2025, CALDERON and approximately eight others were driven and let out of a van in an unknown location. CALDERON said she took off running and continued to walk and run for approximately 2 ½ hours, until someone "found" her.  CALDERON said that it was hard to run because the "agents" had taken her shoelaces.  CALDERON could not provide the names or identifying information for any of the others who were allegedly held with her, except that one woman was pregnant, and one man was named "Francisco."  When asked why she could not provide more details for

people CALDERON had been allegedly held with for days, she said she
was too busy praying.

        l.   CALDERON claimed that during the eight or so days she
was held, she was not given any food, only water.  CALDERON said at
no time did she seek any medical attention once she was "rescued."

    33.   When confronted with the contradictory facts, to include
the footage at the Jack in the Box, her phone records not supporting
being on the phone with anyone at the time she was arrested, and the
historical location data indicating her other phone being in the
vicinity of Bakersfield before she was found on July 3, as described
above, CALDERON would alter her story to try explain these
discrepancies; when that was not possible, she provided no plausible
explanation at all.  In addition to the above, when confronted with
video footage showing she was not on the phone at Jack in the Box
parking lot, CALDERON indicated the phone was in her bra and she was
talking on it.  Then when she was taken, she was somehow able to
hide the phone on her person.

    34.   At one point during the interview, CALDERON stated the
attorney for Movement Legal instructed her and Co-Conspirator 1 not
to notify law enforcement and to wait until they do a media
interview on Monday (July 6).  According to CALDERON, she had also
been advised to keep her phone off by Movement Legal.

    35.   Throughout the entire interview, CALDERON was adamant that
she was taken by masked men and that others were similarly detained.

    H.   <u>Co-Conspirator 1 Interviewed</u>

    36.   Upon releasing Co-Conspirator 1, indicated she had
questions and started to reengage with law enforcement.  SSA
Browning advised she had already asked for an attorney and clarified

19

if she now wanted to speak with law enforcement.  Co-Conspirator 1 indicated she now wanted to speak with law enforcement, and she had questions.  The conversation was recorded.

      a.    Co-Conspirator 1 claimed that almost everything she told law enforcement and the media was relayed to her by others. According to Co-Conspirator 1, it was not CALDERON who told her she was arrested in the Jack in the Box parking lot; Co-Conspirator 1 learned this from her aunt.

      b.    Co-Conspirator 1 agreed to let agents look at her phone and showed agents a text message from a person stating that CALDERON was in Earlimart, California.[6]

      c.    Co-Conspirator 1 received photos from "Edith" showing CALDERON after she was picked up in Earlimart, California.  The photos on Co-Conspirator 1's phone depict CALDERON with dirt on her face, her hair in disarray, sweat on her clothes, and overall poor condition.

---

[6] HSI later interviewed the Good Samaritan.  He told agents that CALDERON showed up at his door – he does not know her – and asked for help claiming that her phone was dead, and asked if she could charge her phone.  CALDERON reiterated her kidnapping claims.  The Good Samaritan then loaned CALDERON his phone and someone later came and picked CALDERON up in Earlimart.

 

      d.    I believe that these photos were created to make it appear as if CALDERON was in custody and that she had been mistreated while there.  While her face is dirty, she has no other visible dirt on her skin; while there is what appears to be sweat along her neck, that is the only location.  These photos are not consistent with someone who had been running/walking in the desert for several hours.  Also, I know based on my training and experience that many individuals are aware that law enforcement removes individuals' shoelaces while they are in custody.  However, had CALDERON actually been in law enforcement custody, her necklace would also have been removed, and if she had been released, her shoelaces and all personal property would have been returned.

    37.    I believe there is probable cause to conclude that CALDERON and others were preparing to hold a press conference falsely claiming CALDERON was "freed," where these photographs would

have been shown, to further the hoax kidnapping story and increase donations to the GoFundMe solicitation and obtain other benefits.

38.  I further believe that there is probable cause to conclude that CALDERON and others first conspired to falsely claim CALDERON was in federal custody, and then conspired to thwart federal law enforcement from locating CALDERON by making false statments, all the while knowing that HSI was searching for CALDERON, for their own personal gain.

///

## V.  **CONCLUSION**

39.  For all the reasons described above, I submit there is probable cause to believe that CALDERON has violated Title 18, United States Code, Section 371 (Conspiracy), and Title 18, United States Code, Section 1001 (False Statements to a Federal Officer).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 16TH day of July
2025.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE